# IN THE SUPREME COURT OF TEXAS

══════════
No. 13-0861
══════════

CANTEY HANGER, LLP, PETITIONER,

v.

PHILIP GREGORY BYRD, LUCY LEASING CO., L.L.C., AND PGB AIR, INC.,
RESPONDENTS

══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS
══════════════════════════════════════════════════

JUSTICE GREEN joined by CHIEF JUSTICE HECHT, JUSTICE JOHNSON, and JUSTICE WILLETT, dissenting.

The Court holds that Cantey Hanger conclusively established its affirmative defense of attorney immunity because its alleged conduct occurred within the scope of its representation of Simenstad in the divorce proceeding. ___ S.W.3d ___, ___. While I agree with much of the Court's description of the attorney immunity doctrine and the purposes underlying it, I think the Court overlooks an important element of the form of attorney immunity at issue in this case—that the attorney's conduct must have occurred in litigation—and applies the attorney immunity doctrine in a manner that results in a much broader, more expansive liability protection. I would hold that Cantey Hanger's summary judgment evidence failed to conclusively establish that its alleged conduct

occurred in litigation and that summary judgment was therefore improper. I would affirm the court of appeals' judgment.

The circumstances in which lawyers may be subject to civil liability to nonclients are wide and varied. *See, e.g.*, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 (2000) ("[A] lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances."). To ensure that attorneys may practice their profession effectively and zealously advocate for their clients without subjecting themselves to claims from nonclients, rules have developed to protect certain attorney conduct from civil liability. To fully understand these rules and the effect of the Court's opinion on them, it is important to review the development of the attorney immunity doctrine.

In Texas, the attorney immunity doctrine, as it applies to litigation or other related proceedings, has developed under two closely related legal theories.[1] The first, on which the Court purports to rely, originated more than a century ago with the broad declaration that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Kruegel v. Murphy*, 126 S.W. 343, 345

---

[1] There are additional legal theories that preclude liability for an attorney's otherwise actionable conduct. For example, the rule of privity generally prevents third parties from suing an attorney for legal malpractice in any context. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999) (recognizing the general rule and an exception to the general rule based on an attorney's negligent misrepresentations); *Barcelo v. Elliott*, 923 S.W.2d 575, 577–79 (Tex. 1996). Moreover, a third party's reliance on an attorney's representations made in certain adversarial contexts might be unjustified as a matter of law. *See Chu v. Hong*, 249 S.W.3d 441, 446 n.19 (Tex. 2008); *McCamish, Martin, Brown & Loeffler*, 991 S.W.2d at 794 ("Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context."). For other possible examples of immunities or defenses available to an attorney, the comments to the Restatement (Third) of the Law Governing Lawyers section 56 and the entirety of section 57 are instructive. Because there are multiple legal theories that might preclude an attorney's liability, I believe that parties and courts should clearly articulate the theory and authority on which they rely because the label "attorney immunity"—as Cantey Hanger asserted here—is imprecise.

2

(Tex. Civ. App.—Dallas 1910, writ ref'd). Because the courts of appeals analyzing attorney immunity under *Kruegel* generally require the attorney's conduct to have occurred in the litigation context, I refer to this theory as "litigation immunity." *See, e.g.*, *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287–88 (Tex. App.—Fort Worth 1997, writ denied); *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App.—Houston [1st Dist.] 1994); *Morris v. Bailey*, 398 S.W.2d 946, 947–48 (Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.). Under the second theory, although not raised expressly here but nevertheless important to the context of attorney immunity in Texas, any statement made in the due course of or in serious contemplation of a judicial or quasi-judicial proceeding is absolutely privileged and cannot serve as the basis for a defamation lawsuit. *Shell Oil Co. v. Writt*, ___ S.W.3d ___, ___ (Tex. 2015); *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (per curiam). I refer to this theory as the "judicial proceedings privilege."

Nearly thirty years before *Kruegel*, this Court adopted the Texas Commission of Appeals' opinion in *Poole v. Houston & T.C. Railway Co.*, 58 Tex. 134 (1882). In that case, a seller sought to stop the shipment of goods that had been sold on credit to an insolvent buyer. *Id.* at 135. The buyer and its attorney then engaged in a fraudulent scheme designed to prevent the seller from stopping the shipment. *See id.* at 135, 137. In its simplest form, the scheme required the buyer to fraudulently assign a bill of lading to the attorney, the attorney to intercept the goods by presenting the fraudulent bill of lading to a railroad station agent, and the attorney to return the goods to the buyer. *See id.* Following the successful execution of the scheme, the seller sued the attorney for fraud and tried the lawsuit to a jury. *See id.* The trial court charged the jury "that, to make the defendant [attorney] liable, it must be shown by the evidence that he was acting, not as agent of [his

3

client], but for himself." *Id.* This Court held that the trial court's charge was erroneous because it stated that the attorney could not be liable for fraud committed at the behest of his principal. *Id.* at 137–38. More important to the issue presented today, the Court held that the attorney was not immune from civil liability because his fraudulent scheme was "entirely foreign to the duties of an attorney." *Id.* at 137.

The opinion in *Kruegel* was authored against this backdrop. In *Kruegel*, the plaintiff sued a law firm for "conspiracy, fraud, and perjury of defendants and their counsel . . . by which plaintiff wrongfully and unlawfully suffered an adverse judgment wholly beyond his control." *Kruegel*, 126 S.W. at 344. Specifically, the plaintiff alleged that the attorneys and other defendants "knew that plaintiff had a good, legal, valid, and meritorious cause of action," and that the defendants defeated the plaintiff's underlying cause of action through "concerted action and undue influence and unlawful misuse and usurpation of power of a court." *Id.* The plaintiff further alleged that the defendants, knowing that the plaintiff would pursue an appeal, "unlawfully conspired . . . to defeat plaintiff's appeal." *Id.* The trial court sustained the law firm's special exceptions, and the court of appeals affirmed. *Id.* at 344–45. In doing so, the court of appeals held that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Id.* at 345.

A comparison of *Kruegel* and *Poole* is critical to understanding the context in which litigation immunity applies. In both cases, the attorney or law firm allegedly engaged in conduct that would be actionable without attorney immunity. The only meaningful distinction between the outcomes is the context in which that conduct occurred. In *Kruegel*, the conduct occurred in

4

litigation, while in *Poole* the conduct occurred outside of any litigation. In my view, the only way to reconcile these cases and give meaning to the purpose behind attorney immunity is to require the defendant–attorney's conduct to have occurred in litigation.

Despite clearly announcing litigation immunity's existence, the court in *Kruegel* did little to define its scope and this Court has not, until today, readdressed the issue. The courts of appeals, however, have agreed with my view of *Kruegel* and *Poole* and generally require the attorney's conduct to have occurred in litigation for litigation immunity to apply. *See, e.g.*, *Renfroe*, 947 S.W.2d at 287–88; *Bradt*, 892 S.W.2d at 72; *Morris*, 398 S.W.2d at 947–48. Moreover, the courts of appeals require the attorney's conduct to involve the provision of legal services. *See, e.g.*, *Gaia Envtl., Inc. v. Galbraith*, 451 S.W.3d 398, 404 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (noting that litigation immunity would not apply if an attorney were to physically assault the opposing parting during trial); *Bradt*, 892 S.W.2d at 72 (same). To address the type of concern raised in *Gaia Environmental, Inc.*, federal courts applying Texas law require the attorney's conduct to involve "the office, professional training, skill, and authority of an attorney." *See, e.g.*, *Miller v. Stonehenge/Fasa–Tex., JDC, L.P.*, 993 F. Supp. 461, 464 (N.D. Tex. 1998) (citing *Taco Bell Corp. v. Cracken*, 939 F. Supp. 528, 532 (N.D. Tex. 1996)). The courts of appeals have extended litigation immunity to both an attorney's conduct and statements. *See, e.g.*, *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (statements and conduct); *Morris*, 398 S.W.2d at 947 (conduct).

The policy reasons behind litigation immunity compel the conclusion that, to be entitled to litigation immunity, the defendant–attorney's conduct must have occurred in litigation. One of the

5

most well-known maxims of the legal profession is that attorneys must zealously advocate for their clients. *See Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773, 780 (Tex. 1994) (describing how the Texas Disciplinary Rules of Professional Conduct require attorneys to zealously represent their clients). The courts of appeals have universally reasoned that litigation immunity furthers this goal. *See, e.g.*, *Alpert*, 178 S.W.3d at 405; *Renfroe*, 947 S.W.2d at 288. Without this immunity, an attorney's zealous advocacy at trial would be diluted because the attorney would be forced to balance her own interests against those of her client. *See, e.g.*, *Renfroe*, 947 S.W.2d at 288; *Bradt*, 892 S.W.2d at 72. Ultimately, litigation immunity promotes the ends of justice by ensuring that attorneys can fully develop their clients' cases and pursue all of their clients' rights at trial. *See Morris*, 398 S.W.2d at 947–48. Limiting the application to statements or conduct in litigation serves this ultimate goal without being overly broad and immunizing attorneys for conduct arising from fraudulent business schemes.[2] *See Poole*, 58 Tex. at 137. A limited application of litigation immunity also has the benefit of maintaining procedural safeguards that apply only in litigation. *See, e.g.*, TEX. R. CIV. P. 13 (requiring all of the pleadings, motions, and other papers attorneys file in the lawsuit be signed, certifying that the attorney has read them and believes that they are not groundless and brought in bad faith or to harass, and authorizing sanctions for an attorney's violation of the rule); TEX. CIV. PRAC. & REM. CODE §§ 9.001–.014, 10.001–.006 (allowing for sanctions and the offended party's recovery of expenses).

---

[2] I agree with the Court's holding that there is no "fraud exception" to litigation immunity. The immunity either applies because the defendant–attorney's conduct occurred in litigation, or it does not apply at all.

The Court recognizes that this form of attorney immunity traditionally applies in the litigation context and purportedly requires Cantey Hanger's alleged conduct to have occurred in the divorce proceeding.[3] *See* ___ S.W.3d at ___ n.6. But the Court conducts very little analysis to determine whether Cantey Hanger's alleged conduct actually occurred in litigation. Instead, the Court summarily concludes that Cantey Hanger's "alleged conduct was within the scope of its representation of Simenstad in the divorce proceedings, was not foreign to the duties of an attorney, and is thus protected by attorney immunity." *Id.* at ___. This conclusory analysis constitutes no analysis at all, and is, in actuality, merely a scope-of-representation test. This scope-of-representation test cannot be the law, or almost anything an attorney does would be protected from civil liability. This is not the law in Texas and is inconsistent with the approach the Restatement

---

[3] The Court also suggests that this form of attorney immunity applies outside of the litigation context. ___ S.W.3d at ___ n.6. I therefore briefly address the inadequate basis for the Court's suggestion. The two unpublished cases the Court cites are either distinguishable or were erroneously decided. The first, *Campbell v. Mortgage Electronic Registration System, Inc.*, No. 03-11-00429-CV, 2012 WL 1839357 (Tex. App.—Austin May 18, 2012, pet. denied) (mem. op.), held that an attorney was entitled to litigation immunity for his conduct relating to his representation of a lender in a non-judicial foreclosure proceeding. *See id.* at *6. However, the *Campbell* court's statement of the applicable law relied on cases that limit the application of the immunity to "litigation," "lawsuits," or situations in which the attorney may be sanctioned by a court. *See id.* at *5 (citations omitted). The *Campbell* court then implicitly recognized litigation immunity's contextual requirement when it concluded that "[n]either the Campbells' petition nor their response to the motion to dismiss alleged that the Attorney Defendants committed any wrongful acts outside of the foreclosure *proceedings*." *See id.* at *5–6 (emphasis added). The wording of the court's holding, coupled with the fact that foreclosure proceedings employ specific notice and process protections and may become highly adversarial, demonstrate that the *Campbell* court recognized litigation immunity's contextual requirement. *See* TEX. PROP. CODE § 51.002 (mandating that any foreclosure must involve notice to the borrower, occur at a specific time and place (often a courthouse), and provide notice of the sale to the public). The second case the Court relies on, *Reagan National Advertising of Austin, Inc. v. Hazen*, No. 03-05-00699-CV, 2008 WL 2938823 (Tex. App.—Austin July 29, 2008, no pet.) (mem. op.), is also unavailing. There, the court of appeals stated that the attorney immunity doctrine was not "limited to [the litigation] setting," but tempered its statement by holding that the summary judgment evidence established the attorney's alleged conduct occurred in "an adversarial dispute in which litigation was contemplated, impending or actually ongoing." *Id.* at *8. The *Hazen* court's holding harkens to this Court's jurisprudence addressing the judicial proceedings privilege, which applies only in limited contexts. *See Shell Oil Co.*, ___ S.W.3d at ___; *James*, 637 S.W.2d at 916–17; *see also discussion infra* at ___. Therefore, the *Hazen* court's statement that the immunity's application was not "limited to [the litigation] setting" provides no support at all.

adopted. *See Chu*, 249 S.W.3d at 446 (Tex. 2008) ("An attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases."); *cf.* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 cmt. c (2000) ("[A] lawyer is not always free of liability to a nonclient for assisting a client's act solely because the lawyer was acting in the course of a representation.").

The outcome of this case is dictated by its procedural posture. This case comes to the Court on review of the trial court's grant of Cantey Hanger's motion for traditional summary judgment on its affirmative defense of attorney immunity. The Court correctly states that a party moving for traditional summary judgment has the burden to conclusively prove its affirmative defense, and that reviewing courts "take as true all evidence favorable to the nonmovant, and . . . indulge every reasonable inference and resolve any doubts in the nonmovant's favor." ___ S.W.3d at ___ (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). However, a correct application of this standard of review to the summary judgment evidence before us requires a different result.

Cantey Hanger supported its motion with the affidavits of two of its attorneys who swore that Cantey Hanger was "retained to represent Ms. Simenstad in her divorce proceeding," including pursuing post-judgment remedies and claims against Byrd's estate in bankruptcy, and that all of its actions "were made in the course and scope of representing Ms. Simenstad." Cantey Hanger also included the divorce decree in the summary judgment record. The divorce decree awarded Simenstad three aircraft, made Simenstad responsible for the ad valorem taxes, liens, or assessments

8

associated with the aircraft, and required Simenstad's attorneys—by then Cantey Hanger—to prepare any documents necessary to effectuate the transfer of the airplanes within ten days of its entry.

In response to the motion for summary judgment, the plaintiffs submitted an affidavit in which Byrd swore that Simenstad had never been an owner, officer, manager, or director of Lucy Leasing or PGB Air. He also swore that "Cantey Hanger was to draft the documents to effectuate the transfer of the airplane for me to sign on behalf of Lucy Leasing," and that "Simenstad sold one of the airplanes that was awarded to her in the Divorce Decree" over one year after the entry of the divorce decree. Further, Byrd swore that Simenstad signed the bill of sale as a "manager" of Lucy Leasing, which made Lucy Leasing liable for the sales tax incurred by the transaction.

This summary judgment evidence is lacking. The divorce decree was a final judgment that terminated the underlying divorce litigation, *see Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001) (stating that final judgments dispose of all pending parties and claims), and merely establishes that the parties had litigated a divorce that resulted in each party being awarded certain property. Although divorce litigation arguably could be extended by pursuing post-judgment remedies or an appeal or even by executing documents required by a divorce decree, the summary judgment evidence here does not conclusively establish that Cantey Hanger's alleged conduct occurred in any such extended litigation.[4] The affidavits reveal nothing about whether Cantey Hanger's actions related to any post-judgment remedies or enforcement actions. Even assuming that preparation and execution of documents as provided for in a divorce decree could continue the

---

[4] Because of my view of the evidence, I need not address whether or to what extent such post-judgment actions might extend the litigation.

9

litigation, Cantey Hanger's alleged drafting of the bill of sale was not the type of transfer document the divorce decree contemplated. The divorce decree contemplated a transfer from Lucy Leasing (a company awarded to Byrd under this decree) to Simenstad within ten days of its entry. Although the trial court struck the bill of sale and we may not consider it, it is uncontroverted in the summary judgment evidence that the airplane was sold more than a year later and the purchaser was a third party. It is also uncontroverted that Simenstad signed the bill of sale, although she may have signed under the Byrd surname and as a manager of Lucy Leasing. The fact remains that the divorce decree contemplated only documents to transfer ownership of the plane from Lucy Leasing to Simenstad, not documents to effectuate a sale from Simenstad to a third party. That the allegedly fraudulent sale may have potential tax implications for a company awarded to Byrd under the divorce decree is inconsequential because, under this record, the litigation had ended and the decree did not address the subsequent sale to third parties of property awarded in the divorce decree.[5]

Viewing this evidence in the light most favorable to and indulging every reasonable inference in favor of the plaintiffs, I cannot conclude, as the Court does, that Cantey Hanger conclusively established that its alleged conduct occurred in litigation. Rather, the summary judgment evidence allows for the reasonable inference that Cantey Hanger's drafting of the bill of sale, if it occurred as the plaintiffs allege, constituted participation in a fraudulent business scheme that took place well after the divorce litigation ended. I therefore conclude that this case is similar to *Poole*, under which

---

[5] In my view, it is nonsensical to hold that Cantey Hanger met its summary judgment burden to establish that its conduct occurred in litigation based on the plaintiffs' response to Cantey Hanger's motion for summary judgment and the attached affidavit alleging tax consequences as a result of the alleged conduct. Cantey Hanger's motion and evidence did not mention taxes or assert any such connection to the divorce litigation.

10

the Court held that an attorney was not immune for his involvement in a fraudulent business scheme that arose out of an arguably adversarial relationship between a seller and an insolvent buyer.[6] *See Poole*, 58 Tex. at 135, 137.

My conclusion that Cantey Hanger failed to conclusively establish that its alleged conduct occurred in litigation is supported by a comparison to the context in which the judicial proceedings privilege applies.[7] The judicial proceedings privilege is not raised directly, but because Cantey Hanger's motion for summary judgment raised attorney immunity generally, it is helpful to consider

---

[6] The Court faults this approach, arguing that it improperly focuses on whether the conduct was meritorious. *See* ___ S.W.3d at___. While it is true that the focus must be on the type of conduct, and not whether that conduct was meritorious, this principle guides courts only in determining whether the alleged conduct involved the provision of legal services, not whether the conduct occurred in litigation. *See Bradt*, 892 S.W.2d at 72 (explaining that if an opposing attorney assaulted the plaintiff during trial, the assault "would not be part of the discharge of the attorney–appellee's duties in representing a party in the lawsuit"). Limiting the type-of-conduct principle to this purpose finds support in this Court's opinion in *Poole*. In that case, the attorney's presentation of a bill of lading—a document of legal significance—was certainly squarely in the scope of the attorney's representation, but was nevertheless determined to be part of a fraudulent business scheme. *See Poole*, 58 Tex. at 135, 137. I look to all of the evidence surrounding Cantey Hanger's alleged drafting of the bill of sale—also a document of legal significance—and conclude that the alleged drafting occurred outside of litigation. I do not infer or conclude that the alleged drafting did not involve the provision of legal services, and therefore do not run afoul of the type-of-conduct principle.

[7] I note that this Court has previously recognized attorney immunity based on the judicial proceedings privilege only for defamation claims, a claim not brought in this case. However, several other jurisdictions have extended the application of their judicial proceedings privilege to both statements and conduct. *See, e.g.*, *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 380–81 (Fla. 2007); *Price v. Armour*, 949 P.2d 1251, 1258 (Utah 1997). Moreover, other jurisdictions allow their judicial proceedings privilege to shield against causes of action other than defamation. *See, e.g.*, *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 235, 237 (Colo. 1995) (all causes of action except for malicious conduct, fraud, and negligent misrepresentation); *Simms v. Seaman*, 69 A.3d 880, 890–91 (Conn. 2013) (all causes of action except for malicious prosecution, abuse of process, and vexatious litigation); *Echevarria, McCalla, Raymer, Barrett & Frappier*, 950 So. 2d at 380–81 (all causes of action); *Price*, 949 P.2d at 1258 (intentional interference with business relationships, and noting in dicta that the privilege should apply to all causes of action); *Clark v. Druckman*, 624 S.E.2d 864, 872 (W. Va. 2005) (all causes of action except for malicious prosecution and fraud). The effect of the Court's opinion in this case may be an extension of the judicial proceedings privilege to post-proceeding conduct.

11

the context in which the privilege applies and the policy underlying it.[8]  Regarding context, the judicial proceedings privilege requires the attorney's or law firm's statements to have been made in the due course of or in serious contemplation of a judicial proceeding or quasi-judicial proceeding. *See Shell Oil Co.*, ___ S.W.3d at ___.  This can be established with proof that the statement was made: (1) in the due course of any aspect of a judicial proceeding, including "open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case," *see James*, 637 S.W.2d at 916–17; (2) in the due course of "proceedings before executive officers, and boards and commissions which exercise quasi-judicial powers," *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942); or (3) in serious contemplation of a judicial or quasi-judicial proceeding, *Shell Oil Co.*, ___ S.W.3d at ___.  Here, Cantey Hanger's affidavits do not indicate whether there was an ongoing judicial or quasi-judicial proceeding, nor do they indicate that Cantey Hanger's conduct occurred in "open court, pre-trial hearings, depositions, affidavits[,] any of the pleadings or other papers in the case," or any other aspect of a proceeding.  *See James*, 637 S.W.2d at 916–17.  Nor do the affidavits indicate that Cantey Hanger's conduct occurred in serious contemplation of a judicial or quasi-judicial proceeding. *See Shell Oil Co.*, ___ S.W.3d at ___.  Cantey Hanger did not establish the applicability of the judicial proceedings privilege, just as it did not establish the applicability of litigation immunity.

The Court holds that attorney immunity shields Cantey Hanger from liability arising from its alleged drafting of the bill of sale more than a year after entry of the divorce decree.  Instead of

---

[8] As it relates to attorneys, the judicial proceedings privilege "is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." RESTATEMENT (SECOND) OF TORTS § 586 cmt. a (1977).

limiting this form of attorney immunity to the context of litigation, the Court's cursory analysis implicitly adopts a test in which attorneys are shielded from civil liability to nonclients if their conduct merely occurs in the scope of client representation or in the discharge of duties to the client. This holding enlarges the scope of litigation immunity in a manner that does not comport with its purpose and protects attorneys from liability for conduct involving a transaction foreign to the plaintiffs and the divorce court and outside the context of litigation. This test is not supported by *Poole* or *Kruegel*, is contrary to every published court of appeals opinion on the subject, and has been flatly reject by the Restatement. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 56 cmt. c, 57 (2000).[9]

Moreover, the Court's holding that Cantey Hanger's alleged conduct is not actionable creates a troubling jurisdictional dichotomy on remand. On one hand, the court of appeals' holding that the plaintiffs' fraud claims against Simenstad for "conspir[ing] with Cantey Hanger to falsify an airplane bill of sale . . . are not claims attempting to enforce the terms of the decree" and are therefore not within the continuing, exclusive jurisdiction of the divorce court, 409 S.W.3d at 776, remains intact because it was not challenged on appeal. On the other hand, the Court holds that the plaintiffs' fraud claims against Cantey Hanger, which are based on the same transaction, are barred because the alleged conduct was within the scope of its representation of Simenstad in the divorce proceeding. ___ S.W.3d at ___. Based on the Court's opinion today and the unchallenged portion of the court

---

[9] Texas has not adopted sections 56 or 57 of the Restatement of the Law Governing Lawyers, but the substance of those provisions is consistent with *Chu, Kruegel*, and *Poole*. *See Chu*, 249 S.W.3d at 446 (recognizing that attorneys may be held liable for conversion and fraud in some cases); *Kruegel*, 126 S.W. at 345 (recognizing a circumstance when an attorney is not liable for fraud); *Poole*, 58 Tex. at 135, 137 (recognizing a circumstance when an attorney is liable for fraud).

of appeals' judgment, Simenstad's alleged conduct regarding the sale of the plane is separate from the divorce proceeding for purposes of the trial court's jurisdiction, but her attorneys' alleged conduct regarding the same transaction is a part of the divorce proceeding for purposes of attorney immunity. This inconsistent results begs the question of whether the trial court on remand actually has jurisdiction over the claims against Simenstad, as the court of appeals held, or whether those claims are within the divorce court's continuing, exclusive jurisdiction.

For its alleged conduct to be protected by attorney immunity, Cantey Hanger must have conclusively established that its alleged conduct occurred in litigation. I would hold that Cantey Hanger did not meet its summary judgment burden and, on this record, the attorney immunity doctrine provides Cantey Hanger no protection from the plaintiffs' fraud, conspiracy, and aiding and abetting claims stemming from the allegedly falsified bill of sale. I would affirm the court of appeals' judgment.

_____
Paul W. Green
Justice

OPINION DELIVERED: June 26, 2015

14